**Najum AZMAT, M.D., Plaintiff,**

v.

**Donna E. SHALALA, Secretary Department of Health and Human Services, Defendant.**

**No. CIV.A.3:99–CV–487–S.**

United States District Court,
W.D. Kentucky,
at Louisville.

Feb. 5, 2001.

Kent Masterson Brown, Christopher J. Shaughnessy, Lexington, KY, for plaintiff.

Julie Brown Apperson, AUSA, John E. Kuhn, Jr., AUSA, United States Attorney's Office, Louisville, KY, for defendant.

## MEMORANDUM OPINION

SIMPSON, Chief Judge.

This matter is before the Court on the motion of both parties for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons discussed below, we will deny the Plaintiff's motion and grant the Defendant's motion by a separate order entered this date.

## FACTS

For the purposes of this motion, the following facts are uncontested.

The Plaintiff, Najam Azmat, M.D. ("Dr.Azmat"), is an allopathic physician practicing general and vascular surgery in Elizabethtown, Kentucky. In November, 1996, he was appointed to the medical staff of Hardin Memorial Hospital (the "Hospital") as a provisional member of the medical staff with privileges in general and vascular surgery.

During the first half of 1997, Dr. Azmat's patient care was monitored and reviewed by the Surgery Department of the Hospital pursuant to its bylaws regarding provisional members of the staff. On October 29, 1997, Leslie Cottrell, M.D. ("Dr.Cottrell"), the Hospital's Medical Executive Committee President delivered a letter to Dr. Azmat on the Committee's behalf. (Complaint, Exh. 1). This letter informed Dr. Azmat that, as part of his "ongoing quality review," his cases were being sent to a Louisville clinic for analysis. The letter recommended that Dr. Azmat immediately begin obtaining a second opinion on all procedures which were not for an immediately life-threatening condition. In addition, the letter stated that Dr. Azmat should acquire assistance from a second physician on all major cases, ex-

amples of which were provided. According to the letter, these recommendations were instituted because twenty-three percent of Dr. Azmat's cases "had either an intraoperative complication and/or post-operative complication over the past year." Finally, in the letter, Dr. Cottrell requested that Dr. Azmat advise him within twenty-four hours whether he would voluntarily comply with these restrictions until "the review process can be completed." Dr. Azmat agreed to comply with the recommendations and informed Dr. Cottrell as such.

On December 5, 1997, pursuant to the Health Care Quality Improvement Act (the "HCQIA"), the Hospital filed a report of "adverse action" against Dr. Azmat with the National Practitioner Data Bank (the "Data Bank"). This report stated:

DUE TO A CONCERNING RATE OF INTRAOPERATIVE AND POST OPERATIVE COMPLICATIONS AND CONCERN WITH APPROPRIATENESS OF PROCEDURES, THE PRACTITIONER VOLUNTARILY AGREED TO COMPLY WITH STIPULATIONS OF OBTAINING A SECOND OPINION BEFORE ALL ELECTIVE SURGICAL CASES ARE SCHEDULED, AND BY OBTAINING A SECOND ASSISTANT SURGEON FOR VASCULAR SURGERY CASES AND SOME SPECIFIC MAJOR GENERAL SURGICAL CASES UNTIL FURTHER REVIEW IS ACCOMPLISHED.

(Complaint, Exh. 7).

On June 17, 1998, Dr. Azmat requested formal review of the Data Bank report with the Defendant, Donna Shalala, Secretary ("Secretary") of the Department of Health and Human Services ("HHS"). On September 15, 1998, HHS informed Dr. Azmat that, based upon its review of the record, it found "no basis on which to conclude that the report should not have

[been] filed with the Data Bank" and denied his request. (Complaint, Exh. 3). Dr. Azmat was permitted to submit a statement regarding the Hospital's report which was included in Dr. Azmat's Data Bank record. HHS also added a statement indicating that it had reviewed the matter and found no basis for concluding that the report was improper or inaccurate.

On February 4, 1999, Dr. Azmat's counsel requested from HHS copies of correspondence received by it regarding Dr. Azmat's request for review of the Data Bank entry. However, HHS replied by stating that those letters were electronically scanned and then destroyed. It indicated that it was having technical difficulties retrieving the electronic copies it made and would forward copies of the letters to Dr. Azmat if the difficulties could be resolved. Dr. Azmat has not yet received any copies of the letters.

### *PROCEDURAL HISTORY*

On July 27, 1999, Dr. Azmat filed suit against the Secretary under the Privacy Act, 5 U.S.C. § 552a, et seq. (counts I and II); the Administrative Procedure Act (the "APA"), 5 U.S.C. § 701 et seq. (count III); the Fifth and Fourteenth Amendment to the United States Constitution (count IV); and the HCQIA, 42 U.S.C. § 11101, et seq. (count V). The Secretary subsequently moved to dismiss the complaint for failure to state a claim upon which relief can be granted. We granted the Secretary's motion with respect to Counts IV and V but permitted Dr. Azmat to maintain his claim with respect to Counts I, II, and III.

Dr. Azmat contends that the Data Bank entry submitted by the Hospital is inaccurate and should not have been reported. In Count I of his complaint, Dr. Azmat alleges that the Defendant's maintenance of the Data Bank entry violates 5 U.S.C.

subsections 552a(d)(2) and (g)(1)(C) of the Privacy Act. He also alleges that, because this violation was willful, he is entitled to recover damages under 5 U.S.C. section 552a(g)(4)(A). In Count II, Dr. Azmat alleges that HHS's failure to provide copies of the previous correspondence in the matter violates 5 U.S.C. subsections 552a(d)(1) and (g)(1)(B). Finally, in Count III, Dr. Azmat alleges, under the APA, that HHS's maintenance of the Data Bank entry is arbitrary, capricious, an abuse of discretion, and contrary to federal statutes and regulations, 5 U.S.C. § 706(2), and that HHS must produce the correspondence he has requested, 5 U.S.C. § 706(1).

### DISCUSSION

In order to support a motion for summary judgment, a moving party must prove the absence of a genuine issue of any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a summary judgment motion, a judge's role is not to weigh the evidence or determine its truth, but to determine if a genuine question of fact exists. *Id.* at 249, 106 S.Ct. 2505. In making these determinations, the court is to view all facts and inferences in a light most favorable to the nonmoving party. *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941 (6th Cir.1990).

In this case, both parties have moved for summary judgment. Thus, we must view the evidence in the light most favorable to the Secretary in respect to Dr. Azmat's motion and in the light most favorable to Dr. Azmat in respect to the Secretary's motion.

### Count I: The Privacy Act— The Data Bank Report

■ The Privacy Act requires that government agencies, such as HHS, maintain in their records "only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute...." 5 U.S.C. § 552a(e)(1). It also permits an individual to request the agency to amend its records when he believes that they are "not accurate, relevant, timely, or complete;...." 5 U.S.C. § 552a(d)(2). If the agency refuses to make these changes, then the individual may bring an action against it. 5 U.S.C. § 552a(g)(1)(A). We are to review the agency's decision *de novo* and have the authority to "order the agency to amend the individual's record in accordance with his request...." 5 U.S.C. § 552a(g)(2)(A). If the agency acted willfully or intentionally, then it is liable to the individual for actual damages, costs and attorney fees. 5 U.S.C. § 552a(g)(4).

We first note that the statement contained in the Data Bank report must be viewed as accurate.[1] Dr. Azmat admits that he voluntarily agreed to the stipulations detailed in the Data Bank report. (Complaint ¶ 21). Also, according to Dr. Cottrell's October 29, 1997 letter, the Hospital's Medical Executive Committee made

---

1. Dr. Azmat does argue that there are three inaccuracies on the face of the report: (1) the "Date of the Action" is reported as 11/24/97; (2) the "Length of Action" is reported as two months; and (3) the restrictions are classified as "Other" limitations on privileges. However, he did not raise these issues with the HHS when he requested formal review. (Complaint, Exh. 2); *See* 45 C.F.R. § 60.14. Therefore, we have no authority to review the Secretary's decision with regards to these claims.

these recommendations because of Dr. Azmat's high rate of intra-operative and post-operative complications. Dr. Azmat, in this lawsuit, does not contest the accuracy of that information. Therefore, there is no need for the Secretary to edit the language of the Data Bank report itself. Our primary task, then, is to review HHS's September 15, 1998 decision and determine whether the Data Bank report itself is "relevant and necessary" to HHS's duties under the HCQIA. Essentially, we must determine whether the decisions made and actions taken by the Hospital regarding Dr. Azmat trigger an obligation to make a report to the HHS.

The HCQIA requires a hospital to submit an adverse action report when it "takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days." 42 U.S.C. § 11133(a)(1).

Dr. Azmat argues that the action taken against him did not amount to a "professional review action" for three reasons: (1) it was not taken in accordance with the Hospital's bylaws relating to a "professional review action," a "corrective action," or a "notice of adverse action;" (2) Dr. Azmat voluntarily agreed to the restrictions; and (3) Dr. Cottrell's letter did not recommend immediate restriction of Dr. Azmat's privileges.

### 1. The Hospital's Bylaws

■ We find no reason to examine the Hospital's bylaws in order to determine if its action constituted a "professional review action." The HCQIA does not require that a peer review proceeding be conducted in accordance with internal bylaws. *Meyers v. Logan Memorial Hospi-*

*tal,* 82 F.Supp.2d 707, 715 (W.D.Ky.2000). The HCQIA's definition of "professional review action" requires four elements: (1) an action of a professional review body; (2) which is taken in the conduct of a professional review activity; (3) which is based on the physician's independent competence; and (4) which adversely affects the physician's clinical privileges.[2] 42 U.S.C. § 11151(9). We recognize that, in certain cases, analysis of the internal bylaws would prove helpful. However, the existence of each of these elements can be determined solely by referencing the facts, the relevant statutory definitions, and the common meanings of words.

Nevertheless, in this case, reference to the bylaws would not help Dr. Azmat. The only reference in the Hospital's bylaws to the phrase "professional review action" states that "A Provisional Staff member: (a) may admit patients without limitation, consistent with the Practitioner's privileges, unless qualified by a professional review action;...." (Pla.'s Summ.J., Exh. 1, § 4.2–2). This bylaw indicates that the Hospital defines "professional review action" as any action which qualifies or restricts a physician's privileges. Thus, if Dr. Azmat's privileges were restricted, then he was subjected to "professional review action" under the Hospital's bylaws. Because the restriction of privileges is a mandatory element under the HCQIA definition of "professional review action," Dr. Azmat's argument that the bylaws increase HHS's burden is unavailing.

### 2. Dr. Azmat's Voluntary Agreement

■ Dr. Azmat suggests that the action taken by the Hospital does not amount to

---

**2.** We note that the definition of "professional review action" does not require that the evidence used by the "professional review body" be compiled by that group. Thus, Dr. Azmat's argument regarding the fact that a non-physician compiled the data about his compli-

cation rate is immaterial. The requirements are that a "professional review body" make the decision and that its opinion be based upon the physician's medical competence. There is no dispute that those requirements are met here.

a "professional review action" because he voluntarily agreed to the restrictions. However, the definition of "professional review action" includes a "recommendation . . . which affects (or may affect)" a physician's clinical privileges. 42 U.S.C. § 11151(9). Thus, the term covers an action to which the physician may agree, as long as it affects or may affect his clinical privileges.

■ In this case, the language in Dr. Cottrell's letter requests that Dr. Azmat abide by the Hospital's recommendations and is sufficient to satisfy the statutory definition. Additionally, the tone of the letter and the immediacy of the institution of the recommendations also suggest that the Hospital was making more than a friendly suggestion. Dr. Azmat acknowledges that there were potentially serious consequences for him if he did not submit to the recommendations. (Azmat Affidavit, ¶ 10). For these reasons, we find no basis upon which to hold that Dr. Azmat's voluntary consent to the action took it outside of the statutory definition of a "professional review action."

### 3. Restrictions on Dr. Azmat's Privileges

■ Dr. Azmat also argues that the Hospital's action did not amount to a "professional review action" because, he claims, the October 29, 1997, letter from Dr. Cottrell "did not recommend immediate restriction of the Plaintiff's medical staff privileges." (Pla.'s Reply Summ.J., at 19). He cites Mathews v. Lancaster General Hosp., 87 F.3d 624 (3rd Cir.1996), to support the proposition that a letter which recommends further review and does not impose immediate restrictions or penalties on the physician does not evidence a "professional review action." We agree with Dr. Azmat's interpretation of the law. However, we disagree with his analysis of the effect of Dr. Cottrell's letter.

■ The letter requests that Dr. Azmat obtain second opinions on all of his elective procedures and assistance from a second physician on all major cases. It indicates that at least one of these requirements "starts today" and intimates that the other restriction should be followed immediately as well. The restrictions themselves were substantial in that they, in most circumstances, constrained Dr. Azmat's clinical privileges. In a letter to the Medical Executive Committee, Dr. Azmat wrote, "this ongoing review and restriction of my ability to practice keeps me from [performing surgery and providing excellent patient care]." (Complaint, Exh. 2). He also complained that the decision had "caused my practice to dwindle to almost nothing." Id. Thus, Dr. Azmat's description of the restrictions makes clear the impact they had upon his ability to furnish medical care at the Hospital. We believe that these restrictions fit squarely within the HCQIA's definitions of "adversely affecting" and "clinical privileges." See 42 U.S.C. § 11151(1) and (3); Mathews, 87 F.3d at 634 ("The definition of 'professional review action' encompasses decisions or recommendations by peer review bodies that directly curtail a physician's clinical privileges or impose some lesser sanction that may eventually affect a physician's privileges.").

■ Nor is it fair to say, as Dr. Azmat argues, that the recommendations had no effect on his privileges because, as a Provisional Staff member, he already faced certain restrictions. (See Pla. Summ.J., Exh. 1, at § 4.2–4). Although the Hospital's bylaws can be read to permit restrictions similar to those imposed by Dr. Cottrell's letter, Dr. Azmat has offered no evidence which would allow a reasonable jury to conclude that the Hospital limited its Provisional Staff members as such. Dr. Cottrell's and Dr. Azmat's letters demonstrate

that the Hospital's recommendations had a negative impact on Dr. Azmat's clinical privileges. A minor impact is all that the HCQIA requires. Therefore, we find that, as a matter of law, Dr. Azmat's clinical privileges were adversely affected.

■ The remaining elements of a "professional review action" are also satisfied. First, the Hospital's Medical Executive Committee meets the definition of a "professional review body." 42 U.S.C. § 11151(11). Next, the continuing review of Dr. Azmat's performance mentioned in Dr. Cottrell's letter amounts to a "professional review activity." Finally, the Hospital took the action based upon an assessment of Dr. Azmat's independent competence, namely his twenty-three percent complication rate. We find, then, that the action taken by the Hospital, through its Medical Executive Committee, amounted to a "professional review action."

■ Thus, 42 U.S.C. § 11133(a)(1) required the Hospital to submit an adverse action report to the HHS regarding Dr. Azmat. As discussed above, it took a professional review action and that action adversely affected Dr. Azmat's clinical privileges. Dr. Azmat appears to argue, additionally, that the action taken was not for longer than thirty days as is required by the HCQIA. However, it is undisputed that the Hospital did not report the action to HHS until thirty-five days after the action was commenced and while the restrictions were still in place. (Complaint ¶ 22). Thus, regardless of the initial understanding between the parties, the Hospital waited until the 30 day period specified in the statute was completed before reporting the action to the HHS. Once these thirty days had run, the Hospital was obligated to make the report. Therefore, we find that there is no genuine issue of material fact as to whether the Secretary erred in refusing to remove or edit the Data Bank entry.

### Count II: The Privacy Act—Access to Correspondence

■ The Privacy Act also requires federal agencies to permit individuals to gain access to their records and files held by the agency. Specifically, it requires that an agency shall, "upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him . . . to review the record. . . ." 5 U.S.C. § 552a(d)(1).

Dr. Azmat complains that HHS violated this statute when it failed to provide him with copies of correspondence received by HHS which he believes are relevant to this dispute. In order to prevail on this claim, Dr. Azmat must show either that these letters are in his record or that they pertain to him and are contained in the system. However, HHS states in its brief that it no longer has the correspondence. It also explains that the two letters were written so as to avoid any specific references to Dr. Azmat (i.e. to propose a hypothetical question to the Secretary regarding how the hospital should handle the situation). Because of that fact, HHS claims that it was unaware that the letters had any connection to Dr. Azmat and, therefore, it did not place them in his file or take care to retain copies of them.

In his Response Brief, Dr. Azmat does not dispute any of the facts or arguments raised by the Secretary. Also, he does not present any evidence to show that the correspondence is in his record at HHS or that the letters "pertained to him" within the meaning of the Privacy Act. Therefore, the Secretary has established that there is no genuine dispute as to the facts and that she is entitled to a judgment as a matter of law.

## 752

■ The APA provides that a reviewing court may set aside an agency action which it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law;...." 5 U.S.C. § 706(2)(A). Dr. Azmat argues that the Secretary's decision not to edit or expunge his Data Bank report is arbitrary and capricious and, therefore, that we should set it aside. However, for the reasons stated above, we believe that the Secretary's decision was in accordance with the law. Therefore, as a matter of law, it could not have been arbitrary or capricious.

### CONCLUSION

For the reasons stated above, we find that there is no issue of material fact and that the Secretary is entitled to summary judgment on the three counts remaining against her. Therefore, we will deny the Plaintiff's motion and grant the Defendant's motion for summary judgment by a separate order entered this date.

### ORDER

For the reasons set forth in the memorandum opinion entered this date and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED AND ADJUDGED** that the Plaintiff's Motion for Summary Judgment is **DENIED** and that the Defendant's Cross Motion for Summary Judgment is **GRANTED**. Counts I, II, and III of the Plaintiff's Complaint are **DISMISSED** with prejudice.